# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| EMANYEL JOSEPH LHERISSON,  )<br>)<br>    Plaintiff,                       )<br>)<br>v.                                        )<br>)<br>)<br>NANCY BERRYHILL,[1]            )<br>Acting Commissioner of     )<br>Social Security,               )<br>)<br>    Defendant.           )  | No. 3:17-cv-00137<br>Judge Trauger<br>Magistrate Judge Brown |

To: The Honorable Aleta A. Trauger, United States District Judge

## REPORT AND RECOMMENDATION

Pending before the court is the *pro se* Plaintiff's motion for judgment on the administrative record (Docket Entry No. 18), to which Defendant Commissioner of Social Security ("Commissioner") filed a response (Docket Entry No. 19). Upon consideration of the parties' filings and the transcript of the administrative record (Docket Entry No. 12),[2] and for the reasons given herein, the Magistrate Judge **RECOMMENDS** that Plaintiff's motion for judgment on the administrative record be **DENIED** and that the decision of the Commissioner be **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff, Emanyel Joseph Lherisson, filed an application for Disability Insurance Benefits ("DIB") under Title II and an application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act on August 30, 2012, alleging disability onset as of July 26, 2012, due

---

[1]Nancy Berryhill became acting Commissioner for the Social Security Administration on January 23, 2017, and is therefore substituted as Defendant. *See* Fed. R. Civ. P. 25(d).

[2]Referenced hereinafter by page number(s) following the abbreviation "Tr."

to depression, anxiety, high blood pressure, attention deficit disorder. (Tr. 16, 266-67, 273, 292, 295). Plaintiff's claims were denied at the initial level on December 20, 2012, and on reconsideration on March 20, 2013. (Tr. 124-25, 135-36, 145, 155-57, 168). Plaintiff subsequently requested *de novo* review of her case by an administrative law judge ("ALJ"). (Tr. 174-77). The ALJ heard the case on March 19, 2015, when Plaintiff appeared with counsel and gave testimony. (Tr. 16, 47-91, 95).[3] Testimony was also received by a vocational expert. (Tr. 89, 92-95). At the conclusion of the hearing, the ALJ referred Plaintiff to undergo a physical consultative examination. On August 11, 2015, at Plaintiff's request, the ALJ conducted a supplemental hearing where Plaintiff again appeared with counsel and gave testimony. (Tr. 16, 100, 110-13, 342). Testimony was received by a different vocational expert. (Tr. 16, 105-110, 113-14). The matter was taken under advisement until September 25, 2015, when the ALJ issued a written decision finding Plaintiff not disabled. (Tr. 13-25). That decision contains the following enumerated findings:

1. The claimant met the insured status requirements of Title II of the Social Security Act through September 30, 2013.

2. The claimant has not engaged in substantial gainful activity since July 26, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: obesity, uncontrolled hypertension resulting in chronic kidney disease and congestive heart failure (20 CFR 404.1520(c) and 416.920(c).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

---

[3]The ALJ initially held a hearing on September 5, 2014, but continued the hearing to allow Plaintiff to submit additional medical records. (Tr. 31-46).

2

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). Specifically he is able to lift and carry 20 pounds on occasion and ten pounds frequently. He can sit 6 hours total; stand 2 hours total and walk 2 hours total. He can continuously use both hands and feet. He can never climb ladders, ropes and scaffolding and can occasionally perform all other postural activities. He should have no exposure to extremes of temperature, unprotected heights, moving mechanical parts, humidity, pulmonary irritants, and vibrations.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant is a younger individual (20 CFR 404.1563 and 416.963).

8. The claimant has a high school equivalent education and attended two semesters of college (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 26, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

12. The claimant's subjective complaints have been evaluated as required under the applicable regulations and rulings.

(Tr. 18-20, 22-24).

On October 18, 2016, the Appeals Council denied Plaintiff's request for review of the ALJ's decision (Tr. 6-10), thereby rendering that decision the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g).

## II. REVIEW OF THE RECORD

The following summary of the medical record is taken from the ALJ's decision:

The claimant's primary and longstanding problem is non-compliance with treatment for hypertension, which has resulted in the development of chronic kidney disease, stage III, for which he is asymptomatic, and congestive heart failure. All of his hospitalizations have resulted from his lack of compliance with medication and recommended treatment for hypertension and the organ damage caused by that non-compliance. He was seen at Nashville General Hospital's emergency room in September 2012 for an earache, but was treated for malignant hypertension, having been off medications for several weeks. He left against medical advice, with his intravenous drip still in his aim, because he was hungry. He had to be threatened with calling the police to get him to return for removal of the device. He then went to Matthew Walker Health Center, where he complained that he had been "released" without treatment of his earache. Blood pressure at Matthew Walker was 205/141 and 204/ 149. Exhibits 3F and 4F. He was hospitalized for four days in December 2013 at University of Alabama at Birmingham's hospital, again not compliant with medications. Discharge diagnosis was uncontrolled hypertension, with acute coronary syndrome ruled out. Ejection fraction was 55%. Exhibit 7F.

He was hospitalized overnight at Skyline Medical Center in February 2014 for hypertensive urgency, chest pain, and hypokalemia, after being off his medications. Echocardiogram again found an ejection fraction of 55%. Exhibit 8F. A day later, he went to General Hospital's emergency room complaining of exertional shortness of breath. He was tachycardic, had a hacking cough, was hyperventilating secondary to very poor respiratory effort, and had coarse rhonchi. He had only a trace pedal edema. He was found to have pneumonia, but was hospitalized due to new onset congestive heart failure, likely secondary to uncontrolled hypertension. He also had an acute kidney injury likely resulting from his uncontrolled hypertension. Echocardiogram showed 40-45% ejection fraction. A sleep study was recommended for likely obstructive sleep apnea (as has been recommended on several occasions, with non-compliance on the part of the claimant). Exhibit 10F. After those hospitalizations, he was seen at the General Hospital renal clinic for chronic kidney disease early stage 3 and uncontrolled hypertension, and the eye clinic, where his blood pressure was also elevated, and he was found to have hypertensive retinopathy. He was hospitalized again overnight in July 2014, after he had been out of medications for a week, for hypertensive emergency. He was again advised to lose weight, comply with medication, and keep his follow-up appointments. He finally established a primary care provider after that hospitalization in the internal medicine clinic. Blood pressure was 154/93. Exhibit 10F. However, he left without being seen for his September 2014 appointment. Blood pressure was 198/135 and later 204/ 141. Exhibit 11F.

He was hospitalized again overnight in March 2015 at General Hospital for hypertensive urgency likely due to medical non-adherence, non-cardiac chest pain, and acute bronchitis. Blood pressure was 201/137 on admission. He was 69 inches tall and weighed 315 pounds. He had multiple excuses as to why he had run out of medications. He said that he could not schedule a sleep study because no one gave him an appointment. He said that he had not followed up with a nephrologist because he showed up at the office, but was told that he did not have an appointment. He had only trace lower extremity edema. Exhibits 13F and 15F.

He was seen infrequently for anything but emergency care. He was seen on a few occasions at General Hospital's clinics in 2014, as recounted above. He was seen at Matthew Walker Health Center in 2012 for otitis media. In March 2013, although his blood pressure was 181/101, he reported that he felt fine. A renal ultrasound that month was normal. Exhibit 4F.

After the hearing, he was referred for a consultative physical examination, conducted by Dr. Watson in April 2015. The claimant complained of chronic dyspnea on exertion, ten pillow orthopnea, bilateral lower extremity edema, snoring, and drowsiness. He had multiple admissions to General Hospital. Ejection fraction was 35-40% (30% in March 2015, but 55% in February 2014). Stress test was negative for ischemia. He had never had a sleep study. He had been unable to work since 2008, when he was diagnosed with hypertension and renal insufficiency (no record of kidney problems, which were entirely asymptomatic other than on bloodwork before 2012). He could not sit or stand long due to bilateral lower extremity edema (usually noted to be no more than slight in medical records). He lived with his mother. He had a high school education and attended some college. On physical examination, his blood pressure was 160/110. He was 71 inches tall and weighed 324 pounds. He was obese, in no acute distress, and sleepy. There was AV nicking on fundoscopic examination. Heart showed regular rate and rhythm. He had 2+ bilateral lower extremity edema. Neurological examination was normal. He had full range of motion of all joints. Impression was obesity, poorly controlled hypertension, chronic renal insufficiency, congestive heart failure, and probable sleep apnea. Whereas Dr. Watson reported in the narrative of his evaluation that the claimant could lift ten pounds, stand and walk two hours and sit six hours, in the attached form, he found that the claimant could lift 20 pounds occasionally, ten pounds frequently, stand and walk two hours each for 30 minute intervals, sit six hours total at two hours intervals, with occasional postural activities, but no climbing ladders and scaffolds, and could not work around heights, moving mechanical parts, humidity, temperature extremes, or vibration, and occasionally operate a motor vehicle. Exhibit 12F. This source later clarified, at the claimant's representative's request, that the claimant's limitations were those reported on the form. Exhibit 14F.

(Tr. 20-21).

5

The ALJ summarized Plaintiff's testimony as follows:

> The claimant testified at the hearing held in March 2015 that his onset date was the date he was diagnosed with congestive heart failure at Meharry. He worked for one week in November 2014 but could not keep up with the walking and needed frequent bathroom visits, so they let him go. The self-employment income reported in 2005 represented work with his uncle cutting hair and grass for four months (earning over $9,000, more money than he ever made at any other job. Exhibit 3D.). He was right handed. He lived with his mother, and helped her with chores. He drove himself to the hearing. He went to church at least once a week for 1to 1.5 hours, but had to go to the bathroom due to kidney problems. Hobbies included playing cards, writing poetry, watching movies at home, doing Facebook, solitaire, and e-mail on the computer. He reported no problems with the law or substance abuse (although treatment records show he served jail time for dealing drugs in the past). He could not work because medications made him sleepy or to have to go to the bathroom (none of those symptoms reported to medical providers). Doctors told him not to do heavy lifting (not documented in the medical evidence of record). His attorney told him to go to Centerstone because he needed help. He had been going since August 2014 (but no Centerstone treatment records submitted since that date). He testified that he walked two miles a week, but not lately due to the weather. Medications helped his leg edema. He could fix meals, go to the grocery store, do laundry, and drive his mother to appointments. He had no income, so his family was paying his bills. He had no insurance. He received indigent care from Meharry He got food stamps. He had Nitroglycerine, but never had to take it. He was not aware of his kidney problems before his emergency room visit. He had been told to diet and exercise at Matthew Walker Health Center. He monitored his blood pressure at home every other day. The day before the hearing, it was 255/ 188, before he took his medications. When his blood pressure was high, he felt dizzy. He had mental health treatment while in school. He was depressed and anxious, and was seen at Centerstone every three to four months for refills (no regular treatment or treatment after August 2014 is shown in the medical evidence of record). He last stayed with friend in Alabama in 2013. He could not return to his detailing job due to lifting requirements and bathroom visits, or a security guard job due to bathroom visits. The claimant testified that he has looked for work after his onset date and he was hired as a car salesperson in 2014 but they let him go.

(Tr. 21-22).

### III. CONCLUSIONS OF LAW

#### A. Standard of Review

Review of the Commissioner's disability decision is narrowly limited to determining whether the decision is supported by substantial evidence and whether the Commissioner applied the right legal standards in reaching the decision. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014) (citing *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)). "Substantial evidence requires 'more than a mere scintilla' but less than a preponderance; substantial evidence is such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). In determining whether substantial evidence supports the Commissioner's findings, a court must examine the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)). A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387 (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Buxton*, 246 F.3d at 773 (citations omitted); *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) ("As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess: 'If the ALJ's decision is supported by substantial evidence, then reversal would not be warranted even if substantial evidence would support the opposite conclusion.'") (citation

omitted). However, where an ALJ fails to follow agency rules and regulations, the decision lacks the support of substantial evidence, "even where the conclusion of the ALJ may be justified based upon the record." *Miller,* 811 F.3d at 833 (citation and internal quotation marks omitted).

## B. Administrative Proceedings

The claimant has the ultimate burden of establishing his entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003) ("[T]he claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). The Commissioner applies a five-step inquiry to determine whether an individual is disabled within the meaning of the Social Security Act, as described by the Sixth Circuit as follows:

> (1) a claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings; (2) a claimant who does not have a severe impairment will not be found to be disabled; (3) a finding of disability will be made without consideration of vocational factors if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four; (4) a claimant who can perform work that he has done in the past will not be found to be disabled; and (5) if a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

*Parks v. Soc. Sec. Admin.*, 413 F. App'x 856, 862 (6th Cir. 2011) (citing *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007)); 20 C.F.R. §§ 404.1520; 416.920. The claimant bears the burden through step four of proving the existence and severity of the limitations his impairments cause and the fact that he cannot perform past relevant work; however, at step five, "the burden shifts to the Commissioner to 'identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity . . . ." *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 628 (6th Cir. 2016) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).

The Social Security Administration can carry its burden at the fifth step of the evaluation process by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. *See Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010); *Wright v. Massanari*, 321 F.3d 611, 615-16 (6th Cir. 2003). The grids otherwise only function as a guide to the disability determination. *Wright*, 321 F.3d at 615-16; *see also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert ("VE") testimony. *Anderson*, 406 F. App'x at 35; *see Wright*, 321 F.3d at 616 (citing SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

When determining a claimant's residual functional capacity ("RFC") at steps four and five, the Commissioner must consider the combined effect of all the claimant's impairments, mental and

9

physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B), (5)(B); *Glenn v. Comm'r of Soc. Sec.*, 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)).

### C. Claims of Error

Plaintiff essentially argues that the ALJ erred by failing to consider the effects of his medications on his symptoms. (Docket Entry No. 18, at 1). Plaintiff alleges that one of his medications, Furosemide, causes him to make frequent trips to the bathroom to urinate, which "makes it hard to hold any position at a job." *Id*. at 2. Plaintiff also alleges that his blood pressure medicine makes him drowsy. *Id.* Plaintiff further alleges that because he is unable to work due to his medications, "it brings on emotional illness as well." *Id*. Defendant contends that the ALJ properly considered Plaintiff's subjective complaints and that substantial evidence supports the ALJ's residual functional capacity ("RFC") determination and that Plaintiff can perform other work. (Docket Entry No. 19, at 4, 7, 8).

The ALJ is required to consider "[t]he type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms . . . ." 20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3) (2015). Allegations of a medication's side effects must be supported by objective medical evidence. *See Essary v. Comm'r of Soc. Sec.*, 114 F. App'x 662, 665-66 (6th Cir. 2004) ("Although Essary testified that she suffered from dizziness and drowsiness as a result of her medications, Essary's medical records make no indication that Essary reported such side effects to any of her physicians. Thus, based on the record before him, the ALJ did not err in finding that Essary suffered no adverse side effects from her medications." (citing *Steiner v. Sec'y of Health and Human Servs.*, 859 F.2d 1228, 1231 (6th Cir.1987))).

10

Although Plaintiff testified that his medications made him drowsy or caused him to make frequent trips to the bathroom to urinate, a review of the medical records reflects that there are no medical records that show that Plaintiff reported these alleged side effects to any medical providers. (Tr. 22, 24, 56, 63, 69, 71-72, 74, 111). "The Sixth Circuit has found that where medical records give no indication that a plaintiff reported side effects of medications to any physician, the ALJ does not err in finding the plaintiff suffered no adverse effects from the medications." *Young v. Colvin*, No. 2:12-CV-00050, 2014 WL 3724844, at *6 (M.D. Tenn. July 25, 2014), *aff'd* (Feb. 26, 2015) (citing *Essary*, 114 F. App'x at 665-66). Plaintiff's medical records also reflect that Plaintiff's health providers at Centerstone frequently noted that Plaintiff did not have any side effects from his medications, and that on March 18, 2014, Dr. Marquetta Faulkner at Nashville General Hospital noted that Plaintiff did not have any side effects. (Tr. 458, 465, 476, 495, 640). Moreover, Plaintiff noted on his function report that he did not have any side effects from any medicines. (Tr. 310).

Further, the ALJ noted that Plaintiff was non-compliant with his medical treatment. (Tr. 20, 24). "An ALJ may consider noncompliance with treatment as a credibility factor." *Robertson v. Colvin*, No. 4:14-CV-35, 2015 WL 5022145, at *6 (E.D. Tenn. Aug. 24, 2015); *Ranellucci v. Astrue*, No. 3:11-cv-00640, 2012 WL 4484922, *10 (M.D. Tenn. Sept. 27, 2012); SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996) ("the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure").[4] "In making a credibility determination, Social Security Ruling 96-7p

---

[4]SSR 96-7p was superseded by SSR 16-3p, which became effective on March 28, 2016. However, because the ALJ's findings and conclusions were made prior to March 28, 2016, SSR 96-7p applies to the analysis of this claim. *Cameron v. Colvin*, No. 1:15-CV-169, 2016 WL 4094884,

provides that the ALJ must consider the record as a whole, including objective medical evidence; the claimant's statements about symptoms; any statements or other information provided by treating or examining physicians and other persons about the conditions and how they affect the claimant; and any other relevant evidence." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 417 (6th Cir. 2011) (citing SSR 96-7p, 1996 WL 374186, at *2). "Social Security Ruling 96-7p . . . requires the ALJ explain his credibility determinations in his decision such that it 'must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Rogers*, 486 F.3d at 248. "'[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.'" *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir.2009) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). An ALJ's "credibility findings are virtually 'unchallengeable.'" *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (citing *Payne v. Comm'r of Soc. Sec.*, 402 F. App'x 109, 112-13 (6th Cir. 2010)).

The ALJ remarked that "all the of the claimant's hospitalizations, as well as his kidney disease and heart failure are related to his non-compliance with medical treatment, specifically his medication, as well as failure to keep appointments for primary care, renal and other specialty care." (Tr. 24). The ALJ also noted that Plaintiff "did not keep mental health appointments, with gaps in service of over six months." *Id.* The record shows that Plaintiff was non-compliant with his medications in August 2012; that on September 26, 2012, Plaintiff had been non-compliant with his

---

at *2 (E.D. Tenn. Aug. 2, 2016) ("It is well-established that, absent explicit language to the contrary, administrative rules do not apply retroactively."); *Scott v. Berryhill*, No. 5:16-CV-108-REW, 2017 WL 875480, at *5 (E.D. Ky. Mar. 3, 2017).

blood pressure medications and left the hospital with his intravenous drip still in his arm; that from September 2013 to July 2014 Plaintiff missed several appointments at Centerstone and was non-compliant with his medications; that in December 2013 Plaintiff was admitted to the hospital due to non-compliance with blood pressure medications; that in February 2014 Plaintiff presented to the emergency room and admitted non-compliance with his blood pressure medications; that in July 2014 Plaintiff was non-compliant with blood pressure medications; and that in March 2015 Plaintiff was noted as being non-compliant with his blood pressure medications and was described as having "past medical history significant for medication noncompliance." (Tr. 364-65, 399-400, 404, 461, 463, 480, 482, 485-86, 491, 494, 499, 505-06, 586, 648, 709, 736, 740).

The ALJ also noted that "[a]lthough [Plaintiff] testified that he qualified for indigent care through Meharry/General Hospital clinics, [Plaintiff] did not pursue recommended treatment or keep appointments." (Tr. 24, 77). The ALJ's consideration of Plaintiff's failure to seek treatment, although he qualified for indigent care, was proper. See *Brown v. Comm'r of Soc. Sec.*, No. 4:12-CV-80, 2014 WL 835193, at *12 (E.D. Tenn. Mar. 3, 2014) ("Plaintiff's claimed inability to pay did not explain why he failed to seek free or low-cost treatment options, or even take over-the-counter pain medication, and thus the ALJ properly discounted Plaintiff's claims of severe pain for inconsistency with Plaintiff's actions and with the objective medical findings in the record."); *Moore v. Comm'r of Soc. Sec.*, No. 14-1123-T, 2015 WL 1931425, at *3 (W.D. Tenn. Apr. 28, 2015) ("Plaintiff argues that his lack of treatment is because he did not have medical insurance. However, there is no evidence that he ever sought treatment offered to indigents or was denied medical treatment due to an inability to pay.").

The ALJ further noted that Plaintiff "sought mental health treatment at the behest of his disability attorney apparently as an attempt to bolster his disability case" and that "[e]ven his Centerstone provider noted that he appeared to exaggerate his symptoms, and was very vague about his answers to questions." (Tr. 24). The ALJ noted that during intake at Centerstone, "it was noted that he struggled to describe any symptoms and was very guarded and vague in his answers," that Plaintiff's "[m]ental status evaluation was unremarkable," and that "Ms. Carter stated that 'client appeared to be exaggerating his [symptoms].'" (Tr. 19, 438, 440). The ALJ properly considered Plaintiff's exaggeration of his symptoms as a factor in assessing Plaintiff's credibility. *See Jones v. Astrue*, No. 3:06-CV-0939, 2008 WL 4552478, at *15-16 (M.D. Tenn. Oct. 7, 2008) (the ALJ's discounting of plaintiff's credibility was proper where evidence indicated that her complaints were exaggerated in nature and where she had exaggerated complaints with symptom magnification).

The ALJ further noted the following:

> The undersigned also takes notice that she observed the claimant during three hearings and during each hearing the claimant sat for the entire time and there was no indication of pain or discomfort at any time. While the hearings may be short lived (although one hearing lasted at least an hour) and not controlling, the fact that the claimant was sent three times does tend to make an impact upon the credibility of the allegations.

(Tr. 22). A court must "accord to the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [the Court] d[oes] not, of observing a witness's demeanor while testifying." *Jones*, 336 F.3d at 476. "The ALJ's findings as to a claimant's credibility are entitled to deference, because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." *Buxton*, 246 F.3d at 773; *accord White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009).

Accordingly, based upon the record, the Magistrate Judge gives substantial deference to the ALJ's credibility assessment, which is "virtually unchallengeable." *Ritchie*, 540 F. App'x at 511; *Ulman*, 693 F.3d at 714 ("[H]armless error analysis applies to credibility determinations in the social security disability context.").

The ALJ determined that Plaintiff had the RFC to perform light work. (Tr. 22). Specifically, the ALJ determined that Plaintiff could lift and carry 20 pounds occasionally and ten pounds frequently; he could sit 6 hours total, stand 2 hours total and walk 2 hours total; he could continuously use both hands and feet; he could never climb ladders, ropes and scaffolding and could occasionally perform all other postural activities; and he should have no exposure to extremes of temperature, unprotected heights, moving mechanical parts, humidity, pulmonary irritants, and vibrations. (Tr. 22-23).

"Residual functional capacity" ("RFC") is defined as "the most [the claimant] can still do despite [his] limitations." 20 CFR § 404.1545(a)(1). "The Social Security Act instructs that the ALJ--not a physician--ultimately determines a claimant's RFC." *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010); *see also Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578 (6th Cir. 2009) ("Although physicians opine on a claimant's residual functional capacity to work, ultimate responsibility for capacity-to-work determinations belongs to the Commissioner."). "[T]he ALJ is charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). Therefore, "[a]n ALJ does not improperly assume the role of a medical expert by weighing the medical and non-medical evidence before rendering an RFC finding." *Coldiron*, 391 F. App'x at 439. The RFC does not need to be based on a particular medical opinion. *Brown v.*

*Comm'r of Soc. Sec.*, 602 F. App'x 328, 331 (6th Cir. 2015). The RFC does not need to correspond to a physician's opinion because the Commissioner has the final authority to make determinations or decisions on disability. *Rudd*, 531 F. App'x at 728.

The ALJ explained that Plaintiff's RFC was based upon on the opinion of Dr. S. Mark Watson, who conducted a consultative physical examination of Plaintiff and submitted a medical source statement opining Plaintiff's ability to do work related activities (physical). (Tr. 23, 698-705, 733). An ALJ may rely on opinions from consulting doctors. *See Brown v. Comm'r of Soc. Sec.*, 591 F. App'x 449, 451 (6th Cir. 2015) ("The ALJ gave 'some weight' to the opinions of three consulting physicians . . . ."). The ALJ noted that no treating source assessed Plaintiff's ability to work or found Plaintiff disabled. (Tr. 23). The ALJ also considered that although the state agency physicians did not find any severe physical or mental impairments, those conclusion were "not supported by the additional medical evidence at the hearing level of adjudication." *Id.*

The Magistrate Judge concludes that the ALJ properly considered the entire medical record in determining Plaintiff's RFC and finds no error in the ALJ's RFC analysis and determination.

The VE testified that given Plaintiff's RFC Plaintiff could perform jobs as assembler, packing line worker and sorter. (Tr. 23, 109). The ALJ determined that the VE's testimony was consistent with the Dictionary of Occupational Titles. (Tr. 23, 109-10). By supplemental interrogatory, the VE confirmed that, although the DOT does not define any jobs that allows an individual to change positions, these such jobs would allow for an alteration in positions. (Tr. 24, 354). This determination was based upon the VE's knowledge of jobs and labor market and what is acceptable by employers from job placement experience and employee contacts. *Id.* Thus, based upon the record, the Magistrate Judge concludes that the ALJ properly considered the testimony of the VE

16

and properly determined that jobs are available in significant numbers in the national economy that Plaintiff can perform. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) ("Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question, but only 'if the question accurately portrays [plaintiff's] individual physical and mental impairments.'") (citation omitted); *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512-13 (6th Cir. 2010).

Accordingly, based upon the entire record, the Magistrate Judge concludes that substantial evidence supports the ALJ's decision.

## IV. CONCLUSION AND RECOMMENDATION

For the reasons explained above, the Magistrate Judge **RECOMMENDS** that Plaintiff's motion for judgment on the administrative record (Docket Entry No. 18) be **DENIED**, and the Commissioner's decision be **AFFIRMED**. The parties have fourteen (14) days of being served with a copy of this Report and Recommendation to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this Report and Recommendation within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, 142, *reh'g denied*, 474 U.S. 111 (1986); *see Alspaugh v. McConnell*, 643 F.3d 162, 166 (6th Cir. 2011).

**ENTERED** this 3rd day of January, 2018.

/s/     Joe B. Brown
JOE B. BROWN
United States Magistrate Judge